The first case we will argue today is case 19-7-15, Donald Trump v. Mazars USA. Mr. Strawbridge? Before these cases, Mr. Chief Justice, and may it please the Court, the subpoenas at issue here are unprecedented in every sense. Before these cases, no court had ever upheld the use of Congress's subpoena power to demand the personal records of a sitting president. And no committee of Congress had even tried to compel production of such a broad swath of the president's personal papers, let alone for the stated purpose of considering potential legislation. There is a reason that this is the first time a congressional committee has attempted such a gambit. It has long been understood that because Congress's subpoena power is implied, it is auxiliary and subordinate. And when that power is deployed against the president, it must yield absent any longstanding tradition or particularly compelling showing of need. The committees can satisfy neither condition here, and that should decide this case. The committees contend that these subpoenas satisfy the limits this Court has always applied to congressional subpoenas, but their arguments would render those limits meaningless. For example, they contend that this Court should ignore the committee's avowed improper purpose, so long as they simply tack on a broad reference to potential legislation. They claim that Congress can use subpoenas to uncover individual wrongdoing, simply because that will always inform the sufficiency of existing laws. And they challenge this Court's ability to even question the constitutionality of the potential legislation that they rely upon. The committee's obvious overreach is sufficient to invalidate these subpoenas, but the Court simply does not proceed against the president as it does against an ordinary individual. The committees have not even tried to show any critical legislative need for the documents these subpoenas seek. Now, it is no secret the relationship between the House of Representatives and the president is frayed, but this is neither the first nor the last time that one House of Congress will be at odds with the president. The rule that the Court applies here will affect not only this president, but the presidency itself. The Court should deny the blank check they seek and reverse the decisions below. Mr. Strawbridge, I want to make sure that I understand the scope of your argument. Your brief begins by questioning whether the House has any power to subpoena presidential records, but you seem at the end of the brief to pull back from that. You say that such subpoenas, quote, press the outer limits of Congress's authority, end quote, and that there is every reason to doubt whether subpoenaing the personal documents of the president is a necessary incident of lawmaking. Do you concede any power in the House to subpoena personal papers of the president? I think it is very hard to imagine that the House is ever going to have the power, you know, pursuant to its legislative powers to subpoena the records of the president, because quite frankly, the House has limited powers to regulate the presidency itself. So I think it's very difficult to imagine a situation where it's implied power to subpoena. Well, that's another formulation for what I was just focusing on. Difficult to imagine, reason to doubt. In other words, does your position recognize in a particular case that the Congress, the House may have such authority, and that in such a case, it would be for the courts to decide whether it's exceeded any bounds in that situation? Yes, we have argued that at a minimum, this court should apply the demonstrated need standard that it has applied in other cases when there is an attempt to assert process that targets the president. Okay, so you say there is some power in the House, you think there's a high standard. I understand the House to concede there is some limit to its authority. So it sounds like at the end of the day, this is just another case where the courts are balancing the competing interests on either side. Is that the wrong way to look at it? Well, I don't think that we're asking this court to do anything different than it has to do in an ordinary case. We're just noting that the restraints upon the powers of Congress are emphasized in this case, because this is a separation of powers dispute. Thank you, counsel. Justice Thomas? Justice Thomas? Justice Ginsburg? Counsel, in so many of these prior cases, it was a cooperation. For example, tax returns. Every president voluntarily turned over his tax returns. So it gets to be a pitch battle here, because President Trump is the first one to refuse to do that. And initially, he said, because of an audit was ongoing. Now it seems to be broader than that. But the aura of this case is really sauce for the goose that served the gander as well. So how do you distinguish, say, whitewater when President Clinton's personal records were subpoenaed from his accountant, or even Hillary Clinton's law firm billing record was subpoenaed? It seems that in prior cases, you say this one is one of a kind, but it seems in prior cases, it was a much greater collision of interests. Take the Nixon tapes. How do you distinguish all of those cases? Watergate, whitewater, the Paula Jones case? Well, Your Honor, we distinguish them in a number of ways. With respect to relatively recent vintage, and in separation of powers disputes, this court has generally, such as in Mill Canning, look back for a much longer precedent for the type of issue that needs to be decided examples of the encroachment upon the separation of powers. And the recent examples, there are just a handful of them that the House identifies are too recent, under that structure as the court recognized in Southwest General. Now, it's also important to all of those cases actually involve cooperative efforts. And as the court recognized below, consent is not the measure of constitutionality. In none of those cases was there a challenge to the scope or to the power of the legislative committee, in that case, to request those documents. And I think whitewater- Thank you, counsel. Justice Thomas. Yes, thank you, Chief. Counsel, I'm very interested in, do you think that there are any implied powers for the Congress to request or to subpoena private documents? I think that there might be limited powers in some cases for the House to subpoena private documents, although the court has been very clear in Watkins and a number of other cases that Congress lacks any power to just inquire- Could you define what you mean by that limited power? Well, I think that we don't quarrel with the general notion that Congress has some implied power to exercise its legislative powers. And we recognize that in some cases, Congress has been able to seek information that would be directly relevant to its consideration of potential legislation. But as the D.C. Circuit recognized in sense that the Select Committee and Judge Livingston recognized below, most often that's going to take the view of forward-looking information, perhaps aggregated information, and not an attempt to reassemble a precise factual history. In the D.C. Circuit opinion, it says that this sort of information or subpoena should be requested under the impeachment power. What's the line between the subpoena, legislative subpoena, and an impeachment-related subpoena? Well, in Kilbourne, this court recognized that there are two very different powers, and that when impeachment is properly pending before either body of the House, the ability to subpoena pursuant to impeachment is coextensive with that of the courts. Of course, court subpoenas are not unlimited. But that has no bearing on this dispute because the parties, the committees, have waived any reliance on impeachment, or could they? These committees don't even have jurisdiction over impeachment. So regardless... Justice Breyer? Well, I'd like to follow up on both Justice Thomas' and Justice Ginsburg's questions. As to Justice Thomas' questions, are you saying that Sam Ervin's subpoenas, which were done under the legislative power at the time of Watergate, which were fairly broad, are you saying they were unlawful, that the court should not enforce them? Yes or no? And as to Justice Ginsburg's question, I would like to know why, since in Watergate and other cases, Watergate particularly, the court gave contested material involving the very workings of the presidential office to the prosecutor, why isn't whatever standard applies to personal papers, a weaker one, not a stronger one? Well, if I can answer that last question first, I think that the court cannot refuse to see what others see, to quote Rumley, and the threat in this case of subpoenaing decades' worth of papers, not only of the president, but of the president's family members, of his children, of his employees, poses an obvious problem with respect to harassment and infringement upon the ability of the executive to discharge his duties 24 hours a day. Unlike Congress, the president is never in recess, and these types of subpoenas are going to be particularly troublesome and burdensome. Are you saying that a weaker case, whatever it is, why wouldn't whatever standard applies to the standard for material that is the workings of the administration at the time? Well, setting aside any executive privilege concerns, which I understand is not the focus of your question, the answer is because Congress, or this court, has repeatedly emphasized in Kilbourn and Watkins and everywhere else that Congress lacks any power to inquire into the private affairs of any individual. And that's distinct from whatever interest they may have informing themselves about the workings of government. Now, that informing power does not extend to the president. It generally applies to lower executive branch officials and agencies. Thank you. I see. What about the first question? Are you saying that the Ervin Committee subpoenas were unlawful? Yes or no? We do not argue that, and we do not need to address the power of impeachment because it's not an issue in this case. It wasn't impeached. Justice Alito? Counsel, are there any circumstances in which a House of Congress can justify a subpoena for a sitting president's personal records on the ground that it wants to use the president as a case study for possible broad regulatory legislation? I think it's difficult to imagine for a couple of reasons. One is even setting aside the fact that the president, this court, has always required some showing that the information being sought is pertinent. And I think that the swath and the scope of the subpoenas that are issued here create serious problems even in an ordinary case. But to directly answer the question, no, the president's personal papers are not related to anything having to do with the and to empower the committees to simply declare him a useful case study is to open the door to all sorts of oppressive requests. You could have subpoenas directed seeking all of Jimmy Carter's financial history simply because he used to be a peanut farmer and they want a case study on agriculture. You could have all sorts of requests for medical records, for educational records, any imaginable detailed personal records because Congress does have the general power to ask you one other question. I think you said that Congress has limited power to regulate the conduct of a president. Does Congress have any power to regulate the conduct of the president, which is an office that is created by the constitution itself and not by Congress? The answer to that, I think it's clear from this court's case, is it's not very much, which is why it frequently applies avoidance principles to avoid even having to decide whether Congress has attempted to reach the president. Now, the one example, obviously, in recent history is the Nixon versus General Administrative Services case. But even in that case, it was a very limited right to regarding presidential documents. One could imagine maybe some hypothetical or there'd be some limited personal papers that might be relevant to a question regarding custody of official documents. But of course, even in that case, what saved the constitutionality of that statute was the fact that it was not seeking the president's personal papers and that control remained in the executive branch. Justice Sotomayor? Counsel, there is a long, long history of Congress seeking records and getting them, as Justice Ginsburg pointed out, from presidents. And in some of those cases, we have said, especially Eastland and McGrane, that a congressional subpoena is valid so long as there is a conceivable legislative purpose and the records are relevant to that purpose. I see a tremendous separation of powers problem when you're talking about placing a heightened standard or a clear statement, your various formulations of this, on an investigation that a committee is embarking upon. Now, I understand your complaint about the financial services subpoena on the money laundering issue. But are you disputing that the stated purpose of the intelligence committee subpoena at issue? Investigation efforts by foreign entities to influence the U.S. political process and related to the financial records of that, those were irrelevant to that purpose and that's an illegitimate purpose by the investigative committee, by the intelligence committee? Well, taking the relevance question first, yes, even if you accepted that there was some legitimate legislation that could be had that reached the president, because what we're seeking here is presidential finances, when you look at the... I'm sorry, pardon, sir. Not presidential finances. We're asking for his personal returns before he became president. Those are very different things and we're not asking him to produce it and some of the subpoenas that Congress through history as far back as 1792 have asked for personal papers of the president while being president. This is before he was president. He's not in possession of them. These are subpoenas to private entities. Okay, so there are a number of issues there. With respect to the custodian issue, this court, even going back to Eastland, has always recognized the ability of a person who stands in the president's, whose records are in the hands of a third party to come in and challenge them and that's certainly the case here. Well, those papers all have to do with executive privilege questions and they're not personal papers. All those cases have to do with papers that belong to the office of the president. Again, these are personal papers. Briefly, counsel. Yeah, Eastland didn't even raise that issue. Eastland was in fact personal papers, but with respect, I guess the main point I would make is whatever presumption this court has previously applied in cases that involve separation of powers, it should not put any finger on the scale for Congress's asserted legislative power in this case. Indeed, in numerous separation of powers cases, starting with Kilbourn, the court has declined to extend any presumption that Congress had a legitimate power. That was also true below in the D.C. Circuit in Tobin, in the Senate Select Committee case, and even in the AT&T cases. Justice Kagan? Good morning, Mr. Shrobridge. I think what strikes me about this case is, you know, this isn't the first conflict between Congress and the president, as many of my colleagues have pointed out. We've never had to address this issue and the reason is because Congress and the president have reached accommodations with each other and sometimes one has gotten more and sometimes the other has gotten more, but there's always been this accommodation seeking. And what it seems to me you're asking us to do is to put a kind of 10-ton weight on the scales between the president and Congress, and essentially to make it impossible for Congress to perform oversight and to carry out its functions where the president is concerned. And you're quite right in what you said before, that this isn't going to be the last such case, and I wonder whether that fact isn't a good reason to reject your proposed rule? Well, no, I don't think that that's the case, and for several reasons. One, the fact that this is the first time that Congress has attempted to subpoena this scale and this scope of documents from the president, and none of the other historical cases involved a direct subpoena for the president's documents in the way that this one does, I think requires this court to draw a line. It is unfortunate that the House did not attempt to seek these documents directly from the president or engage in any negotiation, but simply ran to third-party custodians and forced the president to bring this, among other things, that has the effect of limiting the number of defenses the president can bring. But even on the test this court has always applied in this scenario, these subpoenas fail every hallmark of a legitimate legislative investigation. And whatever power Congress has to conduct oversight of lower branch agencies or inform itself as to the workings of government, these documents are not relevant to that, and that power does not extend to the president, who is a separate constitutionally created officer. Yeah, and then I think some former presidents might contest the idea that these subpoenas go further than has ever gone before, and this gets me back to what Justice Breyer has said, is that these subpoenas are for personal records, where the president is just a man. They're not for official records, where the president might have executive privilege, where we have to worry about the conduct of governance and about the way the executive branch operates. And as with Justice Breyer, I guess I would like to hear your views on why that wouldn't suggest that there is a lower standard here, not a higher one. Well, I guess because the fact that they seek personal documents doesn't mean that they're targeting the president. And indeed, both the Oversight Committee and the House Intelligence Committee have identified the president in his role as president as one of the motivating factors for their investigation. Secondly, as this court has noted, even in Clinton v. Jones, when it rejected a broader immunity argument, there's still a need to ensure that the president is not going to face undue harassment or distraction, and there's a necessity to minimum by applying the demonstrated need standard in which- Justice Gorsuch? Counsel, I'd like to pick up right there where you left off. You argue that there is no demonstrated need, no substantial legislative purpose. The House is before us, and I'm sure we're going to hear from them that there is a substantial legislative need. Why should we not defer to the House's views about its own legislative purposes? For several reasons, Justice Gorsuch. To begin, the subpoena power is an implied power, and this court made clear most recently in NFIB v. Sebelius that Congress cannot even use its implied powers to challenge the structure of government. A subpoena targeting the president's personal documents is a challenge to the separation of powers. In Morrison v. Olson, as well, the court did not apply a presumption on either side of that dispute precisely because it pointed out, in his opinion, there's simply no need for a presumption on either side, whatever might normally apply in a case against an ordinary individual, because the president has his own powers that are created by the Constitution. And then, of course, this court, in a number of cases, as we describe, has recognized, going back to Chief Justice Marshall, that we do not proceed against the president as we do against an ordinary litigant. And so, whether that was in Cheney, whether that was the limiting instruction given to the APA- Counsel, I'm sorry to interrupt you, but I guess my question was more practical than that. Why is this subpoena not supported by a substantial legislative need? Well, I guess three answers. Congress has not really identified with any specificity what actual valid legislation it could enact that directly reaches the president. Even if it had, it hasn't identified how documents going back upwards of 10 years, in some cases, completely unlimited, and seeking the most minute financial details, not only about him, but his children and his grandchildren, every credit card swipe, every check, has anything to do with some purpose that would actually be permissible legislation. And I think that any allowance of the case study rationale that the House has relied upon for the Financial Services Committee is a door that opens to endless subpoenas and harassment any time one party controls one House of Congress opposite from the president. Thank you, Counsel. Justice Kavanaugh? Thank you, Chief Justice, and good morning, Mr. Strawbridge. On your argument that the Nixon demonstrated specific needs standards should apply or the demonstrably critical standard, explain for me how that would play out in practice in a case like this. Well, in a case like this, obviously, where Congress is asserting its desire to enact general legislation, I think it's going to be very difficult. I don't hold out the possibility that they could meet the demonstrated need. I mean, I don't completely rule out that possibility, although I think it is telling that the House devoted all of one sentence to each of these subpoenas, attempting to just assert very broadly that they meet the demonstrated need criteria. But if there were some situation in which Congress was actually, you know, had put forth a statute for which they needed some information to decide whether to enact the statute, the statute was valid. And for some reason, the president's personal papers were necessary to inform Congress. And perhaps in that case, it could meet the demonstrated need statute. I can't imagine that any of these subpoenas could come close, given how far back they look and how much of a dragnet they set up. These are the kinds of subpoenas that the court said raised specific questions about whether they're really attempting to expose alleged wrongdoing, as opposed to achieve a valid legislative end. Secondly, following up on Justice Kagan's point about the future, on page six of your supplemental letter brief, you say that, quote, it is likely that civil litigation over the subpoenas would have been foreclosed had the committee issued them to the president, end quote. And you say this case is different because the subpoenas were issued to a third-party custodian. And there's an implicit assumption there that I just want to make sure of, namely that absent a court order, the private custodians plan to comply with the subpoenas, even if the client directs or requests them not to comply. Is that correct? The recipients of these subpoenas have indicated that they consider it to be a dispute between the president and the House of Representatives and absent some sort of court order regarding its validity, they feel obligated to comply. And this court in Eastland recognized that it's just not reasonable to expect in this situation the third-party custodian to risk contempt of Congress or other collateral consequences. And there needs to be a vehicle to allow for review, especially in this case where the president is suffering a personal injury. Thank you, counsel. General Wolk? Mr. Chief Justice, and may it please the court, these cases are truly historic. Three different congressional committees have targeted not the official records of the president but his personal records, stretching back years before he was even a candidate for office. The potential to harass and undermine the president and the presidency is plain. It's not to ask that before the House delves into the president's personal life, it explain in some meaningful way what laws it is considering and why it meets the president's documents in particular. The subpoenas here don't even come close. That creates two problems for the House. It can't satisfy any standards sensitive to Article II and the separation of powers. And indeed, as in Rumley and Watkins, this court should not decide a serious constitutional question the full House itself has not confronted. Counsel, you spend a lot of time in your brief documenting that the purpose of these subpoenas was actually investigatory rather than legislative. And if that is a pertinent consideration, I wonder how a court is supposed to look at it. Should a court be members of House committees be subject to cross-examination on why you were really seeking these documents? No, Mr. Chief Justice. I want to be clear. I don't think any of that would be permissible. All we are saying is that you should review the subpoena on the basis of the contemporaneous objective record that is the basis for the legislative subpoenas themselves. So we have not in our brief turned to legislator's statements. We haven't said that they should be able to get discovery into their mental processes or anything like. We have said that Chairman Cummings' memo shows the objective purpose as wrongdoing. But more important, I would just point to the mismatch between the breadth and duration of the subpoenas and their asserted purposes. I think with respect to all three, they don't match up with what the committees say they're doing if you look at the information they're seeking. Thank you, Counsel. Justice Thomas? Mr. Wall, what if, following up on the Chief Justice's question, what if it was clear from those statements that you reviewed that their intention was actually to remove the President from office rather than the sort of pretextual reason that it is for legislative, pretextual legislative reasons? I do think if you look at the statements, and we haven't urged that, but if you do, yes, I think they make clear that the subpoenas are not in aid of valid legislation. That's the only enumerated power to which Congress has pointed here. The House has not relied on impeachment. And so you would simply say the subpoenas are invalid. And to tie that into Justice Gorsuch's question earlier, I think we're not asking to go I'm just saying if you look at pages 46 and 54 of the red brief, and you look at what they actually say about their intended legislative proposals and then why they need the documents, it's paper thin. They don't give you any specifics on what they're thinking about doing or any specifics on why they need the documents. And that's not an accident. It's not the product of carelessness or thoughtlessness. It is because the purpose here is to expose wrongdoing, and the House has never really tried to substantiate why it needs these documents in service of its legislative powers. Thank you. Justice Ginsburg. One must investigate before legislation. The purpose of investigation is to frame the legislation. You don't have the legislation in mind. You want to explore what is the problem. What legislative change can reduce or eliminate the problem. So, for example, the Ethics in Government Act. Congress may decide that it needs to brief up that legislation. It may also decide that for financial disclosure purposes, there should be disclosure of tax returns. So, those are legislative purposes. Investigate to see if you need legislation of that sort. And then to impugn Congress's motive, and even the policeman on the beat, if he stops a car and gives the reason that the car went through a stop sign, we don't allow an investigation into what the subjective motive really was. So, here you're distrusting Congress more than the cop on the beat. Justice Ginsburg, I absolutely agree that Congress can investigate in service of what legislation might be needed. Our submission is much more modest. When that inquiry involves the President, that you need a somewhat higher standard with respect to purpose, because the room for regulating the President is so much narrower than it is with respect to private parties. And on the need side, because of the dangers of harassing and distracting and undermining the President, and that's a common theme that runs through the court cases, that the President gets some measure of heightened protection because you can't proceed against the President as against an ordinary litigant. And all I'm saying is that Congress hasn't met that standard here. Justice Breyer? Following this up, assume, as I do, that for reasons set out in an opinion by Judge Griffiths, we're not very good courts at deciding disputes between two powerful political branches. So, it should be rare. But if it is in front of us, why not apply the standard that is ordinarily applied to every human being in the United States in respect to, for example, grand jury subpoenas? Any human being in the United States, when he gets a subpoena, can go to a judge and say, Judge, this is overly burdensome. And then he has a chance to show it. And here, if it's the written in Paula Jones, two or three paragraphs of the kinds of things that a President has that are special, special need not to take his time, et cetera. But would you object to a decision of this court that says, apply that, taking into account the special needs of the Presidency, just like other human beings sometimes have special needs. They might be an emergency medical worker, et cetera. I would, Justice Breyer, on two grounds. First, the court and the D.C. Circuit have rejected the analogy to grand jury subpoenas served by prosecutors. These are legislative subpoenas, not subpoenas issued by the executive branch for entirely different interests and they trigger different concerns. These subpoenas need to be in aid of valid legislation, not as a prosecutor's subpoena to probe wrongdoing. And the second is, to take both your question and I think what Justice Ginsburg was going to get at, we do think the analogy to Clinton v. Jones is actually helpful. The court there rejected an absolute immunity, but said the President was entitled to some special protections. And we're here saying the court should take exactly the same approach. We're not saying the House has no power to get at the records of a sitting President. We're saying that it needs to satisfy a heightened standard, because if it doesn't, these requests will become routine. And that weapon in the standing arsenal of the Houses of Congress will, I think, be routinely deployed in a way that harms both the separation of powers and it undermines the presidency. Justice Alito, could you apply the standard that you think is appropriate to the subpoena from the House Intelligence Committee? Sure, Justice Alito. So there the Intelligence Committee says that it's investigating foreign influence in recent elections, but the subpoena goes back to 2010. It doesn't link in any way to foreign transactions, and it targets only the President. I have no idea why one would serve a subpoena that broad, both in breadth and duration, if what one is concerned about is a far more specific topic that would apply, I would think, to federal candidates more generally and more narrowly foreign transactions and to more recent transactions. And there is nothing in the red brief that explains the mismatch. On the other side, the Financial Services Committee says it's investigating money laundering after the 2008 financial crisis, but its subpoena only goes back to the middle of 2016, and again, it targets the President. None of this makes any sense if what you are doing is an aid of legislation. Justice Ginsburg referred to legislation concerning disclosure requirements that would apply to the President, and there's also mention of conflict of interest legislation that might apply to the President. Does Congress have the power to regulate the President in these ways? I think it's very unlikely on the conflict of interest side, Justice Alito, that even the D.C. Circuit did not rely on that because of the constitutional questions it would pose if you disabled the executive for managing some part of the executive branch. I think the financial disclosures are the hardest, and I guess what I would say is, if the House in its brief had explained with any specificity what it might want to do to the Ethics in Government Act and why then it needs the President's documents, we could have that debate. I think the room is probably narrow, but the United States is not saying there's no room, but we don't even get there because all they say is we might want to CEGHR1, which is a bill the House passed before it even issued these subpoenas, and so it's very hard to sort of shoot at a target in the dark. I don't know what the House wants to do with any specificity, so it's hard to say whether that's valid legislation. Justice Sotomayor? Mr. Wall, that's the issue, isn't it? Which is, until Congress investigates, A, it doesn't have a chance to determine what might be valid, and B, we don't have a chance then to look at an actual law and say it may or may not be valid. You're asking a court, in the guise of a heightened review standard, to speculate as to legislation that's not in effect yet. But I want to go back to the subpoenas at issue and their breadth. You know that the Intelligence Committee goes back 10 years, but I think it's fairly common knowledge that Mr. Trump, before he was president, was thinking about running for president for a very long period of time. Why is it that Congress can't believe that looking at longstanding relationships and how those relationships changed or didn't change is important to knowing what undue influence might be occurring? Justice Sotomayor, if it wants to do that, our submission is just a fairly modest one. It needs to do more than wave its hands about general purposes and say the president would be a useful case study for prospective and generally applicable laws. Mr. Wall, in what other setting does any investigative body have to do more than what was done here? I would point to the prosecutor in Nixon. For private records. Well, this particular question hasn't come up to the court before in a constitutional context, but in Nixon, of course, the prosecutor had to show demonstrated specific need. In the Senate Select Committee case, the Congressional Committee had to show... Mr. Wall, please, I don't want you to go to executive privilege cases. I want you to go to papers that indisputably have nothing to do with Mr. Trump while he was a proactive person. They're not asking for these records post being president. They're asking for these records pre being president. I think that makes the problem worse, not better, Justice Sotomayor. They're targeting the personal life of the president before he was a candidate for office. That raises, granted, somewhat different but deeply troubling and equally problematic constitutional concern that you will harass on... Justice Hagan? Mr. Wall, I'd like to go back to your use of Clinton v. Jones because I had read that case differently. Of course, Clinton says that you're supposed to treat the president's requests with respect when the president says, like, I need a deposition scheduled at a different time, or can we have written interrogatories rather than a deposition? But the fundamental claim of presidential immunity or even presidential difference was rejected in that case. What I'd like to know about your argument, I read your brief and I read the president's own brief, and at no place do you make a case as to why these particular subpoenas place a particular burden on the president such that he will be prevented from carrying out his constitutional responsibilities. And that's what I took Clinton v. Jones to be saying, is that's the kind of thing a president has to come in and show, a sort of case-specific argument about burden on the president. And are you making that kind of argument at all? Well, yes and no. Not if what you mean by burden is sort of compiling and delivering the documents to the House. Yes, if what you mean by burden is what I think Clinton v. Jones did, the Clinton v. Jones thing, which is harassing and undermining the president. Now, exactly these subpoenas, well, I mean, I think you can look at it- Harassing and undermining the president, I mean, the point of some of those suits is presumably to harass and undermine the president and the court let them go and let them proceed. And it said, the only thing we're going to be concerned about is if you come into us and say, in defending those suits, you're going to be prevented from performing the responsibilities that we, the nation, need you to perform. Are you making an argument of that kind? Yes. In the courts below, when the House was pressed on the limits of its theory, it said that probably it could not draw the blood of the president or read his teenage diaries. The power that they are seeking and the burden they will impose in the aggregate on the president will, I think, reshape and transform the balance of the separation of power. So yes, we are saying that these subpoenas and certainly these subpoenas taken in the aggregate, once the House has this weapon, will harm and undermine the presidency of the United States. Not just this president, the institution of the presidency going forward. Justice Gorsuch? Counsel, I believe in earlier discussions with Justice Alito, you indicated that Congress might be able to regulate in the area of financial disclosures of the president. And that is one of the interests the House has asserted here. What more would you require the House to do to assert that interest? What would be enough in your mind to demonstrate the heightened need you suggest is needed? I don't think it has to go provision by provision, Justice Gorsuch, or anything like that. But I do think it's got to describe the possible legislation with enough specificity to enable meaningful judicial review. So we know the president's required to disclose certain things from the Ethics in Government Act. Let me stop you there. I'm sorry to interrupt, but let me stop you there. Let's say the House says we're considering legislation on whether to require presidential candidates to disclose their tax returns for a set number of years. Would that be sufficient? And if not, why not? I think that might be. And then you'd have to look at what they were going after from the various campaigns. It wouldn't get you anywhere near these subpoenas or targeting the president, of course. But at least in your hypothetical, they'd be identifying with some detail, some specificity, what they were thinking about doing. Then it would tee up what I think is the hard constitutional question of what's the space for Congress in regulating a constitutionally created officer like the president with respect to disclosures? And that's frankly a hard question. That's the hardest of all the possible legislation they pointed to. I don't see how we can have that debate in this case because they haven't even enabled meaningful judicial review. And that's a fact that I think should cut against the House, not against the president. Justice Kavanaugh? Thank you, Mr. Chief Justice. And good morning, Mr. Wall. I want to make sure we touch on one of your procedural arguments. You say that the full House needs to authorize the subpoenas. The other side, the House, argues that Resolution 507 did so. What's your response to that? The response, Justice Kavanaugh, is that 507, if you look at its terms, it's both a rubber stamp and a blank check. It purports to authorize anything and everything that ever has been done or will be done by the committees. It falls short then even of the fairly meager resolutions in Rumley and Watkins, which at least describe general purposes, general legislative topics. This gets back to my colleague with Justice Gorsuch. And here we're talking about the president. So I know that three committee chairmen understood what they were doing. I don't think 218 members of the House have understood that they understand the gravity of the constitutional question they're teeing up. And so the court often requires a clear statement from Congress when the separation of powers is at issue. We'd say the same thing here. That's the cleanest and narrowest way to dispose of this case. Second question, history and practice matter quite a bit in separation of powers cases, as you know. Justice Ginsburg earlier cited precedent from Watergate and Whitewater, as did Justice Breyer. Can you respond? And those dealt with legislative subpoenas. Can you respond to those points about those precedents? Yeah. So for the first 200 years of the Republic, there's nothing like this. The House's example either didn't involve the president. But about, sorry to interrupt, but specifically Watergate and Whitewater. So that's what I was coming to. I think the Watergate subpoenas were for official records, and obviously they were subject to a heightened needs standard. The Whitewater subpoena is the closest analogy. It's modern. It was never litigated. But I'll grant that subpoena looks very much like this one. I don't think that there's any historical precedent for it. And the concern, Justice Kavanaugh, again, we go down this road and the houses of Congress can weaponize the subpoena power in this new way. That's going to sit in the standing arsenal for years against the president and any other constitutionally created officer. And I don't think it takes much imagination to know where that road will lead or that we will regret having taken Thank you, Counsel. Mr. Letter? Yes. Mr. Chief Justice, and may it please the court. I would like to jump right in and address some of the very key points that have been made by my friends here. Mr. Wall, my very good friend, Mr. Wall, said that the legislation here doesn't match up. Mr. Wall referred the court to the pages of our brief. If you look at pages 17 through 36, you see that we discussed in great detail the purposes of the investigations and the subpoenas. And indeed, the D.C. Circuit said that in telling terms, the House has put legislation where its mouth is. We have specifically provided bills. Mr. Wall said that the full House did not confront the subpoenas. Page 241 of the appendix, I refer you to where the House specifically referred to these very subpoenas, these specific ones. And I don't think Mr. Wall really meant to say that the members, 218 members of the House did not know what they were doing when they passed that. That obviously is not a valid argument to be made. Then we turn to something that came out in answer to Justice Sotomayor's question. Remember, the key records here, some of the key ones that we want are ones that President Trump has not even seen. We want records from for loans. So these are documents that there's no privacy interest in, no constitutional liberty interest, et cetera. Next, we do have limiting principles. The House very much does. This Court's precedent set those. Must be pertinent to a legislative purpose, can't violate constitutionally protected liberty interests or privileges, and can't undermine the President's ability to carry out his responsibilities. Mr. Senator, let's talk about the standard you propose. The quotes in your brief is that concern a subject on which legislation could be had. Could you give me a plausible example of a subject that you think is beyond any legislation that Congress could write? Your Honor, I think the best I can do is refer you to the Court's decision in Kilbourn where the Court there said that Congress didn't seem to put forward any possible legislation there. It had to do with bankruptcy proceedings that Congress was looking into. Do you think bankruptcy proceedings is a subject on which legislation could not be had? Obviously, bankruptcy could be. But in the Kilbourn case, this Court thought that no such reason had been put forward. But no, Congress's legislative authority is extremely broad, especially because of its appropriation. I'm suggesting that your test is really not much of a test. It's not a limitation. It doesn't seem in any way to take account of the fact that we're talking about a coordinate branch of government, the executive branch. Do you have any alternative to that limitless test that would take account of the fact that you're dealing with a coordinate branch of government? Yes, I do, Your Honor. By the way, the test that I'm referring you to was the test that this Court had set about pertinent to a legislative purpose. But, Your Honor, it's what this Court said in Nixon v. GSA and a number of other cases. There would be a limit if Congress is interfering with the President's ability to carry out his claim. It has been made here, nor obviously can it be made. Justice Thomas? Yes, thank you, Chief Justice. Mr. Lutter, I'd like you to discuss how the power of the legislative subpoena power is implied or how we arrive at that power. Because I think that's part of why we're wandering around in the wilderness trying to determine what standards we are to use. Your Honor, this Court has explained in quite a few cases—I think Watkins, Barron, Blatt, others—that the Congress's legislative power and investigative power, which stems from the British Parliament's power, is an obvious and integral part of legislation. We obviously can't have Congress passing legislation in ignorance. And this Court has said, for instance, most recently in Franchise Tax Court, that just because a power is something to be implied doesn't mean that it's not important. For instance, this Court's power of judicial review, that's nowhere mentioned in the Constitution. So, the power to investigate— Another example of a legislative power that is implied. The—I'm sorry, Your Honor, I'm not coming up with something right now off the tip of my tongue. Oh, that's okay. Can you give me the earliest example you have about Congress issuing a legislative subpoena? The Congress investigated the St. Clair Expedition. It didn't actually issue a subpoena in that case, but it's equivalent of the time. And President Washington consulted with his closest advisors and decided to provide Congress with every single thing that it requested. So, that was just several years into the— What's the first example of Congress issuing a legislative subpoena to a private party for private documents? I'm sorry, Your Honor, the Watkins decision has a lengthy discussion of that. I don't have off the top of my head the very first one, but my memory is that this Court describes that in great detail in Watkins. Thank you. Justice Ginsburg? The concern has been expressed that Congress could be using this subpoena power to harass a political rival. So, what is your answer to— What is the principle, the limiting principle that would say, legitimate legislative purpose, yes, looking toward enacting a law, but not to harass a president from the opposing party? Two answers, Your Honor. First is this Court's decision in McGrane, which is extremely important here. Now, McGrane was not seeking papers of the president, but there the lower court struck down and said the subpoena was no good. The congressional investigation was no good because it was inspired by politics. This Court absolutely and flatly and unanimously rejected that as a reason that it said, if there is harassment, the courts can take care of that. And that's the answer to the Justice Department's entire brief. There is no responsible claim here that all that's going on is harassment. And if there is, this Court has said, we're here. Thank you. Justice Breyer? Thank you. In respect to the authorization, was there proper authorization by the full house of the legislative subpoenas? Two points. One, Rooney says, look at the subpoena and its authorization as at the time the subpoena was issued. Here, perhaps, the time that it was the later authorization in the full house was passed. Two, compare it with the Senate Select Committee on Presidential Campaign Activities v. Nixon. Look at the authorization. The authorization there is highly detailed, highly specific, and it suggests they could go after the information held by any person, presumably including the President. This authorization, which came after the challenge, in fact, writes a pretty blank check for anything without detail. Now, those are arguments made by the other side. I'd like to hear what you say. Thank you, Justice Breyer. Several responses, and I'll try to be quick. First, McGrain, this Court said very, very clearly, you don't just look at the authorization. There was no authorization there. Second, yes, Resolution 507 is in part broadly worded, but it is extremely specific in its third whereas clause. Right there on page 241, it refers to these very specific subpoenas. In addition, authorization is much different now in the modern Congress. The modern Congress has authorized committee chairs, has authorized committees to issue subpoenas, and those committees then have, in general, delegated that authority to its chairs. So the modern Congress, there clearly is authorization to committee chairs to issue these subpoenas, and as I said, if there's any doubt at all about that, the full House ratified these very specific subpoenas. Before or after Roomley? I mean, before or after they were issued and challenged? This is after they were issued and challenged. The issuance, as I said, is authorized by House rules, which this Court has said it will not examine, and then the full House, because there subpoenas, we ratify the issuance of these subpoenas. It is extremely clearly worded, page 241A of the Petition Appendix. Thank you. Justice Alito? Mr. Letter, I was somewhat baffled by your answer to Justice Ginsburg about the use of congressional subpoenas for purposes of harassing a president. Your final answer was courts can take care of that, but that's the issue here, whether something should be done to prevent the use of these subpoenas for the harassment of a president. So could you explain what you meant? Absolutely, Justice Alito. This Court in Clinton v. Jones, and in other cases like Nixon v. GSA, has said we are here to protect the president if there is harassment from Congress or private individuals. And here, there clearly, though, is, we think, valid legislative purposes. The four courts below all found that there was. I don't want to cut you off, but I have very limited time. So your answer is that the protection against the use of the subpoena for harassment is simply the assessment whether the subpoena is conceivably, is relevant to some conceivable legislative purpose. Correct. That's what the Court has said, but also, again, Clinton v. Jones and Nixon v. GSA. That's not much protection. In fact, that's no protection, isn't it? It is protection and honor if what Congress is doing is interfering with the president's ability to do his job. These subpoenas are to private parties. The president does not need to do anything. When you talk about interfering with the president's ability to do his job, do you mean this is going to take up too much of his time, or do you, does that include the potential for the use of subpoenas solely for harassment and political purposes? Your Honor, if they were solely for harassment, then they wouldn't meet the standards of they have to be pertinent to a legislative purpose. So I think the combination of all of those provides ample protection, but there's no- You were not able to give the Chief Justice even one example of a subpoena that would not be pertinent to some conceivable legislative purpose, were you? As I said, Your Honor, that's correct because this Court itself has said Congress's power to legislate is extremely broad, especially when you take into account appropriations. Well, so the end result is that there is no protection whatsoever. In your view, maybe this is the correct answer, but in your view, there is really no protection against the use of congressional subpoenas for the purpose of preventing the harassment of a president because the only requirement is that the subpoena be relevant to a conceivable legislative purpose, and you can't think of a single example of a subpoena that wouldn't meet that test. No, Your Honor, because remember, there may be constitutionally-based privileges or things like executive privilege. All right, well, there might be constitutionally-based privileges. Which constitutionally-based privileges apply to a subpoena for records in the hands of a president? Would you name one? Well, it seems to me executive privilege could enter in. State secrets privilege could enter in, depending upon the specific circumstances, Your Honor. Let me ask you one more thing, if I can, and there's time. Are there any limits on using a subpoena for legislation? So, for example, if the salary and the net worth of a future president before election was that of a person who would be regarded as middle class, and Congress says, you know, we want to study possible revisions of tax laws and the provision of services to members of the middle class, so we're going to subpoena all available information about the assets, income, expenditures, and services obtained by this sitting president and his family for purposes of considering that legislation. Would that be permissible? It certainly could be, Your Honor. So here, that's a very good question. Here, remember, the Financial Services Committee is doing an extremely broad investigation of the financial services sector, and there's massive public reporting that before he became president, President Trump's personal records and his businesses and his family have been heavily involved in those very activities, and we're investigating numerous other banks and individuals having nothing whatsoever to do with the president. This is part of a much larger sector-wide, industry-wide investigation, and President Trump Counsel, we have said that personal records with the aim of making the president a case study threaten to run afoul of this court's teaching that there is no congressional power to expose for the sake of exposure, and the other side points to some hypotheticals that are prescripts simply to pass on educational reform legislation or subpoenas of his personal medical records simply to enact general health care reforms. Tell me what we say to ensure against those hypotheticals and against a proposed subpoena that might be just for the sake of exposure. Your Honor, a couple of answers. One is, yes, you said just for the sake of exposure is no good, but this court said that exposure involving government activities can be. Pertinence would be the key, pertinence to a valid legislative purpose, and here, the Intelligence Committee, there's an obvious need to focus on the president's financial records to determine if the president is subject to foreign leverage. It's obvious that it ties in with that legislative purpose. Let me put this, I'm sorry to interrupt you, but we're limited in time. On that issue of what laws are possible, I can see the argument about conflicts of law, but aren't there already a lot of disclosure laws in place? How could this investigation help improve those or change those? I assume what Your Honor is referring to is disclosure laws, disclosure laws by the president. We would have to look to see exactly what the Oversight Committee was looking at. Do we need better laws about conflicts of interest? Do we need better laws about, for example, a president dealing in contracts with government agencies? The Congress could limit government agencies' ability to enter into or keep contracts with elected public officials. In addition, Congress maybe would want to provide for more exposure of assets and conflicts of interest. One last question. Was the breadth of the subpoenas litigated below? Yes, Your Honor. Those exact claims were made, and they are discussed in great detail by the Circuit, so those were fully litigated below. Justice Kagan? Good morning, Mr. Lutter. In talking to the Chief Justice about the limits on congressional power, you said, and tell me if I'm quoting you correctly, you said that a subpoena couldn't impair the president in carrying out his constitutional functions. Is that right? Your Honor, there would have to be a balance there. Okay, but that's what we should be looking to. And then you said no such claim has been made or could be made. And I also took the briefs not to be making that claim, that this subpoena would impair the president in carrying out his constitutional functions. But Mr. Wall told me that he was kind of making such a claim because he thought that this subpoena would undermine the president's job. And I guess I would like you to comment on that. Your Honor, it's fascinating because I wrote a note specifically on that. That argument was not made in the Justice Department's brief, to my knowledge, anywhere. My friend Mr. Wall mentioned it here. But there's no way that this could interfere with the president because he doesn't have to do anything. This is a subpoena to two banks and an accounting firm. And as I said before, in fact, some of the key documents we want, the president probably has never even seen or doesn't even know that they exist. We want to know banks' analyses of his request for a loan, internal bank analyses. But yes, Your Honor, that argument was not made in the briefs. Okay, and if I could get you to talk about the history that some of your colleagues have talked about, what do you think the history shows us with respect to this issue? Your Honor, very briefly, what it shows is it ties in with a key principle of law that this court has said of constitutional interpretation. History can help inform what the Constitution means. There's a lengthy history of presidents either voluntarily or not voluntarily complying with requests for information by Congress. And we went through its presidents, Washington, Jackson, Buchanan, Grant, and then more modern times, Nixon, Carter, Reagan, and Clinton, all complying with, in various ways, either voluntarily or not. For instance, in the Nixon case, Nixon voluntarily provided certain tax returns. He didn't provide all of them. Congress then got more pursuant to statutory authority, like a subpoena, from President Nixon and his family's tax returns. I don't think that either the Justice Department or Mr. Trump answered that hypothetical. History really matters here, and it shows that the amount of history. Thank you. Justice Gorsuch? Good morning, Mr. Leder. Normally, we use law enforcement investigative tools like subpoenas to investigate known crimes and not to pursue individuals to find crimes. That's a principle you're well familiar with from your time in the Department of Justice. And I'm wondering what lending principle you offer us here that can prevent that danger. The first one was, it has to be pertinent to a legislative purpose, but I think as we've explored, that's very, very broad and maybe limitless, some would suggest on the other side, at least. Constitutional privileges, if you're investigating someone in their private capacity, they're going to be few. Maybe attorney-client privilege, things like that. And it can't be burdensome, I heard was your third, but at an age where everything's online and can be handed over on a disc or a thumb drive, that pretty much disappears too. So what is left to protect that important value that I know you share? I do share that, Your Honor. And by the way, burden here, none of the subpoena recipients have plain burden. Your Honor, I answer it this way, because again, it has to be, I'm going to stick with the pertinent to legislative purpose because, for example, Congress did a massive investigation of what happened at 9-11. Obviously, a lot of that- Let me stop you there. If that's where you're going to go, and I thought that might be, Mr. Leonard, I apologize for interrupting, but I would think a federal prosecutor might say that an investigation of an individual could be pertinent to a criminal investigative purpose too, because there's so many federal crimes out there and it's possible this person jaywalked or failed to pay his taxes or whatever his concern is. That's a legitimate investigatory purpose for sure. So what takes us out of that realm and that concern? Your Honor, I think this will largely depend on the courts. The only thing I can suggest that takes it out of that concern is, as we know, Congress can't prosecute, but as we know, it clearly can look into criminal activity in order to figure out whether the criminal laws should be changed. The most obvious example would be this court's decision just a little while ago overturning a key criminal conviction involving white collar crime. Obviously, Congress could do a very thorough investigation of that to determine whether to pass a different criminal law statute that would actually make it a crime to do what was done in Bridgegate. So it's going to be very difficult to separate the two and say that what criminal activity for the purposes of determining if the FBI is doing a good job and needs more money or whether to amend the criminal statutes. There's going to be an extremely rare case where that is going to be invalid on Congress's part. Justice Kavanaugh. Thank you, Mr. Chief Justice and good morning, Mr. Letter. I want to follow up on the line of questioning that several of my colleagues have pursued, the Chief Justice, Justice Ginsburg, Justice Alito, Justice Kagan, and others, which I think come down to the idea of limitless authority and how to deal with that. The other side says that allowing these subpoenas and subpoenas like these, say for medical records, would be a grave threat to future presidencies, the open season, they say, on private records of anyone who is president, and maybe other government officials too. And they worry about the harassing nature of subpoenas like that. You say, Justice Gorsuch was just exploring this. It's okay so long as it's pertinent to a legislative purpose. But I think everyone has explored with you that just about everything can be characterized in terms of a subpoena as pertinent to a legislative purpose. I don't think you could answer the Chief Justice's question about something that wasn't. And the question then boils down to how can we both protect the House's interests in obtaining information it needs to address those interests. I guess the thing I would say is why not employ the demonstrably critical standard or something like that, this is what the other side would say, as something that's borrowed from a different context, but that might serve to balance these strong competing concerns here. Your Honor, that's a very good question. I have several responses. The first one goes to the last thing you said about why not employ a demonstrably critical test. I don't know how the courts would do that without violating the separation of powers. I was reminded recently by the congressional leaders that often they're doing investigations, they don't know where the legislation might go at that point. So I don't know how you would force Congress to do, to show some sort of demonstrably critical reason. But wouldn't it be the same way that it's shown in an investigation where executive privilege is asserted and the demonstrably critical standard in that context has been the tried and true method for about 50 years? Because then, Your Honor, you could look at, you could demand that the executive branch show that its reason for seeking something outweighs the executive privilege claim. But here, remember, we're not dealing with executive privilege at all. These are financial business records. It's difficult to see how these could ever come within that kind of balance that would override Congress's authority to do investigation. The one other thing I can suggest, obviously, is this court has suggested, I believe, is the voters, but also Nixon versus Fitzgerald, where this court said that the president has absolute immunity from certain kinds of claims. The court said specifically that one of the reasons that's okay is because we have congressional oversight of the president. This court specifically used that to justify absolute immunity for the president in other areas. And last is Clinton versus Jones. This court- Can I interrupt right there? What about medical records? Your Honor, medical records of the president would, I think, almost always be not pertinent to valid legislative purpose. On the other hand, if you look at the 25th Amendment, they certainly would be pertinent. Why wouldn't they be pertinent to, say, ethics legislation, healthcare legislation, or the like, in your view? Your Honor, I'm having difficulty thinking of a hypothetical where if Congress is examining and deciding on amendments to the Affordable Care Act, how the president's personal medical records would be relevant to that. As I say, the most important public health statute of many, decades, I don't think would be affected by that at all. I'm sure we can come up with some odd hypotheticals where presidential health would clearly be relevant, maybe changing the statutes that involve the succession of when a president becomes incapacitated, something like that, I suppose. But in general, there would be no valid reason for Congress to be examining the president's personal medical records that I can think of. Thank you, counsel. Mr. Leder, I know you will be delighted to learn that we have time for additional questioning. So I think I'll begin with myself, and then we'll go through in order and just see how far we get. One thing that hasn't come up is the fact that we're dealing here with three separate committees, and we're concerned, as you've recognized, with the potential for harassment. And how does that play in? I mean, at what point does the number of committees investigating the president's personal papers become a factor in an analysis of the issue of harassment? Your Honor, I am very pleased there's more time for questions. But Your Honor, it would again, you'd have to look to Clinton versus Jones. When does it reach a particular stage? We're nowhere near that here. And in fact, the subpoena by the Intelligence Committee matches the subpoena from the Financial Services Committee to Deutsche Bank, because specifically, intelligence did not want to cause too much of a burden to the subpoena. What about, as you know, very shortly in the case, we're going to talk about subpoenas from district attorneys. How does that factor in? I mean, should those be counted in the balance in terms of when congressional subpoenas become harassment? Definitely not, Your Honor, since we have nothing to do with the subpoena advance. We had no contact with the City of New York before that subpoena was issued. And so I don't know how that would tell us anything about what the House of Representatives. What about the Senate? I suppose they can issue subpoenas too, can't they? Of course, Your Honor. So how do you balance that? You've got, in this case, three different House committees seeking subpoenas. You've got the district attorney in New York. You know, depending upon party composition of different bodies in the future, you might have the Senate joining in. How do you measure harassment in a case like that? Your Honor, I think what you would do is if these were subpoenas from the House and the Senate, a massive number of them going to the White House, then there certainly would be, at a certain point, where it would affect the ability of the White House and the President to function. There's no doubt about that. But these subpoenas are to three private businesses involving — Thank you. Justice Thomas, any further questioning? Yes. I'd like to follow up on that, Chief Justice. Mr. Leder, you know, at some point, there's a straw that breaks the camel's back. And it seems as though you're saying that we should look at these in isolation as opposed to in the aggregate. Why wouldn't we look at and look at the full effect and whether at some point it debilitates the President? Your Honor, I'm sorry. I must have misspoken. I meant to answer the Chief Justice's question by saying, yes, if there are a massive number of subpoenas from the House and the Senate to the White House, and the White House can come in and say, look, we can't do anything. All we're doing is answering subpoenas all day long. This is impacting the ability of the President to do his job. Why wouldn't it be limited to the House and the Senate? I mean, it could be every grand jury. It could be every prosecutor. The concern that we had in the Clinton case is at some point this thing gets out of control. One could be manageable, but 100 could be impossible. And your Honor is right. And therefore, if our subpoenas were on top of numerous others from grand juries around the United States, you could look at that. But let me emphasize one more time. Our subpoenas, the three, are not to the President. They are to private business entities. Nothing is required of the President here for these subpoenas to be fully complied with. Not a single thing is required of the President or the White House. Justice Ginsburg, any further questioning? No, I'll pass. Justice Breyer? Yes, he's emphasized it goes to a private person, and it's for tax returns. But the subpoenas that I've seen go far beyond that. They apply to 15 Trump-affiliated entities. They ask for all documents related to opening of accounts, due diligence, closing, requests for information by other parties, etc. Now, that's a lot of information, and some of it's pretty vague. And if somebody subpoenaed you for that information, or subpoenaed your tax accountant, or subpoenaed somebody in your business, wouldn't you at least want to know what was being turned over? Wouldn't you want to ask them? And might that not take time? And might that not take effort? So, my problem is there may be burdens here, third party or not, and not just political burdens. The job of the House and Senate, in part, as the President, is politics. That doesn't bother me. But the Clinton v. Jones information does bother me. And the fact that what I hold today will also apply to a future Senator McCarthy asking a future Franklin Roosevelt or Harry Truman exactly the same questions, that bothers me. So, what do I do? Justice Breyer, I fully understand that concern. None of the subpoena recipients have complained about burden. The reason these subpoenas go back a ways is because, as you know- I'm sorry to interrupt you. I'm not talking about their burden. I'm talking about the President's burden in having to monitor, decide if there are privileges, figure out what his in my opinion, way, way, way beyond just tax returns. Two answers, Your Honor. Yes, we're going far beyond tax returns. But no privilege claim has been made in this case. No party, nobody has raised a privilege claim. Second is we're investigating, for instance, among other things, money laundering. Money laundering requires a looking at a whole range of financial activity. What we're doing here is exactly the kind of thing that Senate and House staff do when they're looking at financial sector and what kinds of reforms should be made to the banking industry. Let me say one more time. There has been no claim of privilege here. There has been no claim that there is a burden. No claim whatsoever. So those may be relevant in different cases, but certainly not this one. Justice Alito? If one House of Congress were to subpoena personal records in the hands of a third party regarding a member of the other House, let's say someone in a leadership position in the other House, do you think that the doctrine of separation of powers would impose any limitation on that subpoena? Very interesting question. Your Honor, the first thing that comes to mind, though, is wouldn't that violate the speech or debate clause? Remember, no member of either the House or Senate can be questioned anywhere else. And so if there's a request for records, if it's tied in in any way to the legislative functions of that senator or House member, that would be invalid. Well, let's say this. It's similar to the subpoenas here. So they don't have anything to do with the performance of the legislative function. They are records regarding the personal activities of this individual, purely personal activities. And we can even say that they concern things that were done before the person was elected to Congress. And does part of your hypothetical include that they would, nevertheless, be pertinent to a legislative purpose? Yeah, pertinent to a legislative purpose. The committee wants to use someone in a leadership position in the other House as a case study for possible legislation. If it met then your hypothetical, I think that that would be a valid subpoena. I'm not aware that it has ever happened in the history of the House or Senate. I'm not, I don't know of any thing that would be like that. Justice Sotomayor, anything further? Yes, that's the whole point, though, isn't it? Justice Alito is raising this hypothetical, because he says, shouldn't then we look at history? And it's only modern history where committees have asked for personal papers. So he presumably would discount that. And he would say, shouldn't we respect the separation of powers, that what's personal to the president is similarly personal to a congressperson? Okay, Justice Sotomayor, I have to disagree strongly with one thing you said, a key part. No, the history, we have history of seeking, Congress seeking personal papers of Jackson, Buchanan, Grant, etc. No, there's been lots of seeking of personal papers by Congress for many, many decades. This is not just a modern practice at all. Justice Sotomayor? Mr. Lerner, I'm wondering if I could ask you to comment on a potential difference between, on the one hand, the Oversight and Intelligence Committee subpoenas, and on the other hand, the Financial Services subpoena. The first two subpoenas address the president's directly, you know, the financial disclosures that the president makes, conflicts of interest, foreign involvement in presidential campaigns. But the Banking Committee, Financial Services Committee, you know, was taking a much broader scope. And when that's true, when Congress doesn't seem to be looking into the president, but in a much broader topic, might there not be some heightened need for Congress to say why it is that they're focusing on presidential records for that purpose? Your Honor, I think that still would get into, would raise major separation of powers problems as a court would have hearing, where the court would ask chairmen of various committees to come and testify as to what they were doing and why. You're certainly right in your description. This is, there are 11 subpoenas issued by Financial Services to members of, you know, banks, et cetera. And only two of them have to do, three subpoenas, two entities have to do with the president. This is a much, much broader investigation. And last is, there's massive public reporting about the subjects of these subpoenas and their banking practices and Deutsche Bank and Capital One have both been sanctioned many millions of dollars by banking regulators for failing to properly comply with money laundering laws. Justice Gorsuch, anything further? No, Chief, thank you. Justice Kavanaugh. Yes, thank you, Chief Justice and Mr. Leder. I want to follow up on Justice Alito's question. And this really goes to the fact that I think that there's concern about what the limiting principle is here. I think pertinent to a legislative purpose is almost no limiting principle at all. At least I think that's what some of the questions have explored. And his hypothetical about a committee would start subpoenaing members of Congress of the other house or of the other party. And you said, well, that hasn't happened, but isn't the whole point that once you start down this road and this court articulates too low a standard, that something like that will start happening. That's the concern that I heard identified or that I took away from that hypothetical. So I want to give you a chance to respond to that hypothetical of why it wouldn't spiral. I greatly appreciate that chance, Justice Kavanaugh. Two responses. First, remember exactly what this court did in Clinton versus Jones. And I was on one of the losing briefs there, but this court said, we're going to let this happen. But the courts will monitor the situation. And if there are abuses, the courts are still here. In addition, Justice Alito's hypothetical, I also realized it might be there getting into things like privilege information or information involving constitutional liberty interests. And this court has struck down criminal convictions, et cetera, for subpoenas that do involve... Well, if it was personal records, exactly identical to the personal records here, but from members of Congress, none of those would apply, presumably, at least under what you've articulated so far today. I think that's right. But again, I come back to Clinton versus Jones. This court issued a very clear decision saying, we're going to allow this one, but obviously the courts are going to monitor this. So if, contrary to what has happened in the past over our lengthy history, if there are situations when the president's ability to do his job is being undermined, thank goodness the courts still exist and they are there to take care of it. Mr. Letter, would you like to take a minute to wrap up? Your Honor, I greatly appreciate that. I'm sorry, just flipping back to my notes. I apologize. As I was saying before, remember that some of the key records here are ones that the president has never seen and never had anything to do with. And we asked the court to focus on the specific subpoenas in this case because we're not dealing with what ifs here. We're not dealing with situations where a lot of the Justice Department argument focuses on, as I said before, fortunately this court exists to fix those kinds of situations should they arise. Thank you, Mr. Letter. Mr. Strawbridge, you have two minutes for rebuttal. Thank you, Mr. Chief Justice. My friend from the other side struggled with every hypothetical that he was given about his ability to set some sort of limiting principle or some category of information or documents about the president that would not be obtainable under his theory. And I think that's very telling because there are no limits to their theories. And in particular, let's just consider the example that was given regarding medical records. There's no reason under his theory why the president and his family and his grandchildren could not be declared useful case studies and therefore Congress would send out a subpoena for their medical records. For that matter, the president eats and drinks like everybody else and Congress naturally has the ability to regulate food safety. But that does not mean that Congress can subpoena medical records or even the president's DNA. My friend refused to even rule out that hypothetical categorically below. And I think it's telling that he can't provide any meaningful limit today. I think that's constant with the fact that they failed to consider what their actual legislative need is. This is an implied power in aid of legislation. It's not a free ranging warrant to investigate wrongdoing going back 10 years. He cites to a laundry list of legislative proposals, almost all of which were passed before the subpoenas even issued and at no point in the argument section of their brief or today does he try to tie any particular legislative proposal specifically to the president, the finances, let alone the vast swath of documents that they seek here. This is not an attempt to preserve the separation of powers. It's an attempt to eviscerate that. On that point, I wanted to note in response to Justice Breyer's question, which I may have misunderstood, the Senate Watergate Committee, in fact, did serve congressional subpoenas under the legislative power and applying the heightened needs standard, the DC circuit invalidated it, just as this court invalidated the attempt to hold in contempt somebody in Kilbourne when it violated the separation of powers, just as the lower courts, every time separation of powers has squarely been presented, hasn't validated it. These subpoenas are overreaching. They're an obvious distraction. They're going to multiply if this court accepts the path that the house is attempting to lay decisions below should be reversed. Thank you. Thank you, counsel. The case is submitted.